UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | |
|---|---|
| ANTHONY GILBERT, STEPHEN MOORE and TERRY SMITH, JR., <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF STATESVILLE, NC and, each in their individual capacities - RON SMITH, WILLIAM E. VAUGHAN, ANDY SMITH, JUNIOR JOHNSON, and SCOTT AUSTIN, <br><br> Defendants. | Civil Action No. _____ <br><br><br><br><br> **COMPLAINT** <br> **(Jury Trial Demanded)** |

**NOW COME** Plaintiffs Anthony Gilbert, Terry Smith, Jr., and Stephen Moore ("Anthony," "Terry," "Stephen" and collectively "Plaintiffs"), by and through undersigned counsel, complaining and stating against Defendants the City of Statesville ("City"), City Manager Ron Smith ("Ron Smith" or "City Manager"), Operations Manager Water Resources Andy Smith ("Andy Smith" or "Operations Manager")[1], Supervisor Junior Johnson ("Johnson"), Director of Public Utilities William Vaughn ("Director"), and Supervisor Scott Austin ("Austin") in their individual capacities, collectively referred as "Defendants" as follows:

## INTRODUCTION

At the beginning of 2024, Plaintiffs were all employees and certified operators at Defendant Statesville's Third Creek Wastewater Treatment Plant ("Third Creek WWTP" or

---

[1] Plaintiff Tery Smith, Jr., Defendant Andy Smith, and Defendant Ron Smith are not related, and Plaintiffs' first names are used herein to avoid confusion of the parties.

"Facility") under the direct supervision and regulatory authority of Scott Austin, the operator in responsible charge ("ORC" or "ORC Austin") of the Facility. Austin's ORC authority was granted and approved by the North Carolina Department of Environmental Quality (NCDEQ), and he was the supervisor of the Plaintiffs at the Facility. Even though ORC Austin worked at the Facility during the day shift, as is commonly and lawfully done in the industry, Terry was delegated certain of his ORC duties as needed during the day shift and Anthony and Stephen were delegated Austin's duties during the night shift since Austin could not be present at the Facility 24 hours per day.

In mid-2024, Plaintiffs learned that since approximately 2023, Austin had established a "whites only" bathroom at the Third Creek WWTP by locking the main bathroom after the day shift thereby preventing Anthony, a black man, from using it during the night shift. Austin had created a "whites only" bathroom at the Facility because he did not "want to sit my white ass on the toilet after a black ass."

Upon learning this information, Terry and Stephen complained to ORC Austin, as their direct supervisor, that the practice was wrong and was racially discriminatory, but were told by Austin to stay out of it. When Anthony learned of it, he complained directly to City management. The Plaintiffs were justifiably mortified by Austin's racially motived animus and discriminatory practice.

Incredibly, instead of investigating the Plaintiffs' complaints of intentional discrimination as required by municipal policy (and applicable state and federal laws) or taking any interim administrative action against Austin during such investigation, the Defendants launched a secret, sham investigation into Plaintiffs' work performance. The Defendants then summarily fired each of the Plaintiffs. To add insult to injury, when both Terry and Stephen attempted to secure employment elsewhere in the field of wastewater treatment at other facilities, the City reported to

prospective employers that each had been fired from the City for "falsifying documents"—a claim utterly without merit and exacting further retaliation because such a claim is tantamount to "black-balling" certified operators from employment in the wastewater treatment plant industry.

Plaintiffs bring this action against Defendants for various unlawful employment practices, including but not limited to racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981 *et seq.* as well as a *Monell* claim against the City in violation of 42 U.S.C. §1983. Plaintiffs also assert North Carolina state law claims for wrongful discharge against public policy, violation of the North Carolina Retaliatory Employment and Discrimination Act (N.C. Gen. Stat. § 143-422.2 *et seq.*), and punitive damages against each of the Defendants. Plaintiffs seek all available legal and equitable remedies available under federal and state law including but not limited to, back pay, front pay, reinstatement, compensatory, punitive damages, and all available equitable relief authorized pursuant to federal and/or state law.

## JURISDICTION, VENUE, AND PARTIES

1.  This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims for relief asserted herein arise under federal law, and pursuant to 28 U.S.C. § 1343(a)(4), as the claims herein seek relief under acts of Congress providing for the protection of civil rights.

2.  This Court has supplemental jurisdiction over Plaintiffs' related state law claims pursuant to 28 U.S.C. § 1367(a).

3.  This Court has personal jurisdiction over the City because it is a municipal corporation located within Iredell County, North Carolina, chartered through the North Carolina legislature, and operates within this District within the State of North Carolina.

3

4. The City has waived governmental immunity to the extent it has procured insurance and/or participates in the risk management pools provided by the North Carolina League of Municipalities. The City at all relevant times was an employer within the meaning of Title VII and N.C. Gen. Stat. § 143-422.2. At all relevant times, it acted by and through its agents, employees, supervisors, policymakers, and final decisionmakers.

5. The Third Creek Facility is a municipal wastewater treatment plant located at 444 Third Creek Road, Statesville, NC in Iredell County and is operated by the City's Wastewater Treatment Division.

6. Plaintiff Anthony Gilbert ("Anthony") is a citizen and resident of Iredell County and is an African American male who was employed by the City's Wastewater Treatment Division and worked at the City's Third Creek Facility as a licensed Grade 3 (WW-3) Certified Wastewater Operator until he was unlawfully fired on December 12, 2024. At the time of his termination, Anthony had been employed with the City for nearly 7 years.

7. Plaintiff Stephen Moore ("Stephen") is a citizen and resident of Iredell County and is a white male who was employed by the City of Statesville and worked at the City's Third Creek Facility as a licensed Grade 2 (WW-2) Certified Wastewater Operator until he was unlawfully fired on December 16, 2024. At the time of his termination, Stephen had been employed with the City for 19 years and was about to retire.

8. Plaintiff Terry Smith, Jr. ("Terry") is a citizen and resident of Catawba County and is a white male who was employed by the City of Statesville and worked at the City's Third Creek Facility as a licensed Grade 3 (WW-3) Certified Wastewater Operator until the City unlawfully fired him on December 11, 2024. At the time of his termination, Terry had been employed with the City for nearly 4 years.

9. Ron Smith ("City Manager")is a citizen and resident of Iredell County and is a white male who was employed by the City of Statesville and served as the City Manager during the relevant time period.

10. William Vaughan ("Director") is a citizen and resident of Iredell County and is a white male who was employed by the City of Statesville and served as the Director of Public Utilities for the City during the relevant time period.

11. Defendant Andy Smith ("Andy Smith") is a citizen and resident of Iredell County, NC and at all relevant times herein served as the City's Operations Manager Water Resources.

12. Defendant Junior Johnson ("Johnson") is a citizen and resident of Iredell County, NC and at all relevant times herein served as the City's Wastewater Treatment Plant Senior Operator for the City and by mid-2024 was the "back-up ORC" at the Facility.

13. Defendant Scott Austin ("Austin") is a citizen and resident of Iredell County, NC and at all relevant times herein served as the supervisor of the Third Creek WWTP facility, licensed as a Grade 4 (WW-4) Certified Wastewater Operator. Austin's regulatory authority as ORC was granted and approved by the North Carolina Department of Environmental Quality (NCDEQ) and the Plaintiffs performed his ORC duties delegated to him by NCDEQ pursuant to law.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

15. At all relevant times, Defendant City was continuously an employer engaged in an industry affecting commerce pursuant to 42 U.S.C. § 2000e et seq.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

16. Plaintiff Anthony filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on March 18, 2025, alleging race discrimination and retaliation.

17. On October 28, 2025, Anthony requested a Notice of Right to Sue from the EEOC, and the EEOC issued Anthony's Notice of Right to Sue on November 28, 2025.

18. Plaintiff Stephen filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on April 30, 2025, alleging retaliation.

19. On October 28, 2025, Stephen requested a Notice of Right to Sue from the EEOC, and the EEOC issued Stephen's Notice of Right to Sue on December 12, 2025.

20. Plaintiff Terry filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on April 28, 2025, alleging retaliation.

21. On October 28, 2025, Terry requested a Notice of Right to Sue from the EEOC, and the EEOC issued Terry's Notice of Right to Sue on November 18, 2025.

22. Each Plaintiff bringing this action has fulfilled all conditions precedent to the institution of this lawsuit by exhausting their administrative remedies.

## FACTUAL ALLEGATIONS

23. The preceding paragraphs are realleged as if incorporated and fully set forth herein.

24. The City of Statesville's Water and Sewer Maintenance Division is responsible for constructing, repairing, and maintaining the City's water and sewer infrastructure.

25. The City operates a wastewater treatment plant known as Third Creek WWTP. Third Creek treats industrial wastewater and raw residential sewage and thereafter discharges it into Third Creek, a tributary of the Yadkin River.

26. The treatment and discharge of effluent from public wastewater treatment systems is regulated through the Federal Water Pollution Control Act which has been commonly referred to as the Clean Water Act since 1972. The Clean Water Act prohibits any entity from discharging pollutants through a point source into the water of the United States, such as Third Creek, unless

6

the entity has obtained a National Pollutant Discharge Elimination Permit ("NPDES Permit" or "Permit").

27. At all times relevant to this action, the City discharged to Third Creek pursuant to NPDES Permit No. NC0020591, issued by the Mooresville Regional Office of NCDEQ.

28. The Permit requires the City to monitor its effluent discharge and report findings related to the discharge. Specifically, among other things, the Permit requires the City to monitor its Third Creek WWTP discharge for the presence of chlorine through the collection and analysis of samples for chlorination and de-chlorination. The City's Third Creek NPDES Permit allows a maximum daily chlorine discharge limit of 28 µg/L (micrograms per liter).

29. The Permit also requires Statesville to report its findings from the discharge samples and notify the Environmental Protection Agency (EPA) and NCDEQ of the results.

30. If it is found that the City is not in compliance with its Permit, the EPA or NCDEQ has the authority to issue administrative orders that require it to correct violations and assess monetary penalties and even issue jail sentences for people who are found to willfully violate requirements of the Permit and endanger the health and welfare of the public or environment.

31. A member of the public, or one of the agencies, can also take legal action against the City to enforce the terms of the Permit. The Permit is effective for five years and can be renewed.

32. The City's discharge or effluent from the Third Creek WWTP is sampled and analyzed several times a day by wastewater operator technicians and written into a daily log. As a Grade IV WWTP, the Third Creek WWTP requires a person with a Grade 4 operator certificate approved by NCDEQ to serve as the ORC for Facility operations.  Austin is the ORC for the Third Creek WWTP and is allowed by law to delegate his ORC duties to lower tiered technician operators employed by the City.

33. However, any technician hired to accept the delegation of duties from the ORC must have either a Wastewater 1, 2, or 3 operator license from NCDEQ. In Statesville, the Wastewater operator technicians are charged with, among other things, the sampling of the discharge for chlorination, de-chlorination every two hours and maintaining a daily log of the findings.

34. Anthony and Terry each hold a Grade 3 (WW-3) wastewater operator certificate issued by the North Carolina Water Pollution Control System Operators Certification Commission (WPCSOCC) under North Carolina law.

35. Stephen holds a Grade 2 (WW-2) wastewater operator certificate issued by the WPCSOCC.

36. As WW-2 and WW-3 operators, Stephen, Anthony, and Terry's delegated duties included operating and maintaining wastewater treatment equipment, monitoring processes, performing routine maintenance and repairs, and collecting samples for laboratory tests, as well as keeping and maintaining detailed records of plant operations, adjusting equipment to meet changing conditions, and ensuring the facility complies with all state and federal regulations.

**Racist Conduct at Third Creek Facility**

37. Defendant Austin's reputation for being racist preceded him at the Third Creek Facility. Upon information and belief, prior to working at Third Creek, Austin was referred to as "little Hitler" due to his being known to dislike black people. Indeed, Defendant Austin often used the "N word" at work and referred to black people as "those people."

38. The Third Creek facility has two bathrooms designated for employee use—one fully functional bathroom that is temperature controlled with both heat and air conditioning ("Main Bathroom"), and a smaller bathroom that was not temperature controlled, and had no modern amenities other than running water ("Small Bathroom").

8

39. At all relevant times, most of the white employees used the Main Bathroom during their shifts.

40. In 2023 without explanation, Austin had a lock installed on the Main Bathroom door and began locking it each day when he left work for the day after his shift during the day.

41. Anthony worked the night shift, during which time the locked Main Bathroom was unavailable for his use, and, therefore, he was forced to use the Small Bathroom during his shift ("Bathroom Issue").

42. The employees, including Terry and Stephen, did not know why the Main Bathroom was being locked for the night shift.

43. In the summer of 2024, Terry specifically asked Austin, his supervisor, why he was locking the Main Bathroom when he left for the day. In response, Austin bluntly stated: **"**I don't want to sit my white ass on the toilet after a black ass."

44. Terry was disgusted by his response and told Austin that he should not single Anthony out like that and that keeping him from using the Main Bathroom was racist. Austin told Terry to stay out of it because it was "none of his business."

45. Shortly thereafter, on a separate occasion while working his shift, Stephen asked Austin, his supervisor, why the Main Bathroom was being locked.

46. Austin gave Stephen the exact same explanation he had Terry and in the same hostilely racist manner said that he did not want to sit on a toilet after a black person. Stephen immediately told Austin that it was racist and wrong what he was doing, and Austin told him to stay out of it.

47. At the time Austin made these statements, Anthony had no knowledge that Austin was locking the Main Bathroom for racially discriminatory reasons, i.e., to physically prevent him, a black man, from using it.

48. Terry and Stephen finally informed Anthony that Austin had admitted to each of them that he was locking the bathroom to keep Anthony, a black man, from using it because he did not want to use it after him.

49. After Terry and Stephen informed Anthony of Austin's reasoning for locking the Main Bathroom before the night shift, Anthony became extremely upset and he sought out City management and human resources to report it.

**Anthony's Protected Complaints to the City and the EEOC**

50. In late summer or early fall 2024, Anthony reported Austin's conduct and statements to City management, specifically, Operations Manager Andy Smith and Human Resources representative Nick Turner.

51. Anthony met with Andy Smith and representatives from the City's Human Resources Department and reported that Austin had been locking the bathroom because he did not want to use the bathroom after Anthony used it at night.

52. In response to Anthony's complaint, Andy Smith reacted angrily while rolling up his sleeves and said to Anthony: "We're going to figure this out today! Did you see a sign that says 'whites only' on the bathroom?"

53. Anthony was startled by his reaction and became very nervous regarding how the Operations Manager responded to his complaint. Shortly thereafter, Defendant Andy Smith stormed out the door.

54. Mr. Turner then apologized to Anthony for Defendant Smith's outburst and conduct saying to him, "that really was not the way that was supposed to go."

55. Shortly thereafter, Anthony contacted the Equal Employment Opportunity Commission ("EEOC") regarding the racially discriminatory conduct he had experienced at Third Creek.

56. Even though a human resources representative was present when Anthony reported Austin's discriminatory conduct, the City's human resources department did not conduct an investigation into his complaints.

**The City's Retaliatory Investigation**

57. Even though the Operations Manager and a  human resource operator heard Anthony's complaint of discrimination, the City did not conduct an investigation into Anthony, Stephen and Terry's separate complaints of Austin's racist conduct.

58. Instead, shortly thereafter, even though each of the Plaintiffs had received satisfactory performance appraisals, and Plaintiff Terry had actually been promoted, the City and its agents, including the Individual Defendants, initiated a sham, retaliatory investigation into their work performance, utilizing, among others, Defendant Johnson as "back-up ORC" to perform the investigation.

59. The investigation was sanctioned by Operations Manager Smith and carried out by his supervisors, Defendants Austin and Johnson.

60. Shortly thereafter, in December 2024, the City terminated Plaintiffs Anthony, Stephen and Terry for allegedly falsifying documents.

61. The City contended that each Plaintiff had allegedly falsified documents by failing to conduct required water sampling for chlorine while simultaneously recording numeric values on daily log sheets.

62. The sham investigation was initiated, and its purported results relied upon by the City after Plaintiffs reported Austin's racist conduct to management and after Anthony contacted the EEOC.

11

63. The City investigated only Anthony, Stephen and Terry, the employees who had engaged in the protected activities of complaining about Austin's racially discriminatory conduct toward Anthony.

64. Prior to their protected activities, Anthony, Stephen and Terry were each fulfilling the City's *legitimate* business expectations and were performing their job duties to the satisfaction of Defendants.

65. The sham investigation relied upon by the City did not identify any falsified data, altered records, or violations of written sampling protocols. In true fact, Anthony, Stephen and Terry did not falsify data, alter records, or violate written sampling protocols put in place by the ORC Austin or otherwise fail to follow ORC Austin's instructions as to how to perform his delegated duties.

66. The investigation also did not identify any harm to the public, regulatory violations, or disciplinary action taken against similarly situated employees who had not engaged in protected activity.

67. At the time of their termination, the Plaintiffs were informed they were being fired for "missing chlorine packets." When Plaintiff Terry informed the Individual Defendants that no packets were missing and that their investigation did not yield reliable results, they did not care.

68. During his termination, Plaintiff Terry asked if he could provide information in defense of their faulty finding of "missing chlorine packets," he was told it would not make a difference. As a result, Terry, and later Stephen submitted grievances to the City appealing their terminations.

69. The City's stated reason for terminating Plaintiffs was pretextual, and Plaintiffs were terminated because they engaged in protected activity by opposing racially discriminatory conduct.

70. The City's sham investigation was controlled and directed by management personnel, the Individual Defendants, who were aware of Plaintiffs' protected complaints and who had been implicated in, or responded adversely to, those complaints.

71. The sham investigation regarding record-keeping did not include interviews of Plaintiffs, did not permit Plaintiffs to respond to the allegations, and did not include interviews of neutral or exculpatory witnesses.

72. The sham investigation relied on selective documents and assumptions rather than objective findings and did not identify any fabricated entries, altered data, or violations of written sampling protocols.

73. The sham investigation did not compare Plaintiffs' conduct to that of similarly situated employees who had not complained about discrimination and who engaged in the same or similar sampling and logging practices at the instruction of ORC Austin.

74. Prior to Plaintiffs' protected activity, the City had accepted the same sampling and documentation practices dictated by ORC Austin without discipline or corrective action.

75. The City's conclusion that Plaintiffs had "falsified" documents was nothing more than a "cover-up" and was not supported by the investigative record and conflicted with the true facts the investigation actually identified. Nevertheless, Defendants terminated Plaintiffs.

76. The City's asserted belief that Plaintiffs engaged in falsification was therefore not an honestly held belief based on a reasonable investigation, but pretext, i.e., predetermined conclusion used to justify retaliatory termination.

77. Plaintiff Terry filed a grievance with William Vaughan, the Public Utilities Director for the City of Statesville ("Director") following his termination. In his grievance, he referred to the Bathroom Issue and his reporting it. Terry sought a meeting with the Director to discuss the

investigation and his termination, but he was denied. Using his authority and discretion, the Director summarily approved Terry's termination without determining if any investigation into Terry's race discrimination complaints had been conducted.

78. Plaintiff Stephen filed a grievance with City Manager Ron Smith. In his grievance, he referred to the Bathroom Issue and his opposing racist conduct. Using his authority and discretion, the Director summarily approved Stephen's termination without determining if any investigation into Stephen's race discrimination complaints had been conducted.

**RETALIATION**
**(In Violation of Title VII of The Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Civil Rights Act of 1991, 42. U.S.C. §1981)**

79. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

80. Plaintiff Anthony engaged in a protected activity when he complained to Defendant Andy Smith and others that Defendant Austin was discriminatorily blocking him from using the Main Bathroom by locking the door to it when he left for the day because Austin did not want to use the Main Bathroom after use by a black man.

81. Anthony engaged in a protected activity when he visited the EEOC in the fall of 2024 to seek guidance concerning the Bathroom Issue, and another protected activity later when he filed an EEOC charge for discrimination and retaliation against the City.

82. At the time of his protected activities, Anthony had a good faith belief that he had been subjected to racial discrimination.

83. Anthony was subjected to an adverse action when the City and the Individual Defendants launched a sham performance investigation of him close in time to his protected activities.

84. Anthony was subjected to another adverse employment action when the City terminated him due to its retaliatory investigation's purported results.

85. As a direct and proximate result of the City and the Individual Defendants' adverse actions, Anthony has suffered general and special damages that were the direct and proximate result of said retaliatory actions including but not limited to back pay, out of pocket expenses, front pay, compensatory damages, costs, and attorneys' fees.

86. Plaintiff Stephen engaged in a protected activity when he reported to Defendant Austin, his supervisor, that he should not lock the Main Bathroom door to keep Anthony from using it because it was discriminatory.

87. At the time that Stephen informed Defendant Austin what he was doing was wrong, Stephen had a good faith, reasonable belief that Defendant Austin was discriminating against Anthony, a black co-worker.

88. Plaintiff Terry engaged in a protected activity when he reported to Defendant Austin that he should not lock the Main Bathroom door to keep Anthony from using it because it was discriminatory.

89. At the time that Terry informed Defendant Austin what he was doing was wrong, Terry had a good faith, reasonable belief that Defendant Austin was discriminating against Anthony, a black co-worker.

90. Stephen and Terry were subjected to adverse actions when the City and the Individual Defendants launched a sham performance investigation of them close in time to their respective protected activities.

91. Stephen and Terry were both fired by the City and thus were subjected to adverse employment actions.

92. Stephen and Terry both submitted grievances to the City, in appeal of their terminations and because their grievances referred to the Bathroom Issue, their grievances constituted protected activities.

93. Stephen and Terry were both subjected to adverse actions when the City through the Director and City Manager summarily denied their respective appeals without further investigation.

94. As a direct and foreseeable result of the City and the Individual Defendants' adverse actions, Plaintiffs Stephen and Terry have suffered general and special damages, including but not limited to back pay, out of pocket expenses, front pay, compensatory damages, loss of benefits, costs, and attorneys' fees.

## RACE DISCRIMINATION
### (In Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and The Civil Rights Act Of 1991, 42 U.S.C. § 1981)

95. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

96. Plaintiff Anthony is a member of protected class because his race is African American.

97. At all times relevant, Plaintiff Anthony was employed by Defendant City within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

98. Plaintiff was qualified for his position as a certified Grade 3 Wastewater Operator, having satisfied all education, experience, and licensing requirements mandated by NCDEQ and the Water Pollution Control System Operators Certification Commission (WPCSOCC).

99. Anthony was treated differently than similarly situated employees in that white employees for the City at the Third Creek WWTP were not prevented from using the Main Bathroom during their respective shifts.

16

100. Anthony at all relevant times herein was qualified for his position as a WWTP operator and was satisfactorily meeting the City's legitimate employment expectations.

101. Despite his qualifications and satisfactory performance, Plaintiff Anthony was treated less favorably than similarly situated white employees with respect to the Main Bathroom.

102. Defendant City, through its supervisors and agents, engaged in intentional discrimination against Plaintiff on the basis of race, including by creating and/or tolerating a racially hostile work environment in which Plaintiff Anthony was subjected to less favorable treatment.

103. Defendant City's conduct (through its supervisors and agents) violated 42 U.S.C. § 2000e-2(a), which prohibits employers from discriminating against employees because of race, and N.C. Gen. Stat. § 143-422.2, which declares North Carolina's public policy against such discrimination.

104. As a direct and proximate result of Defendant City's unlawful discrimination (through its supervisors and agents), Plaintiff has suffered and continues to suffer lost wages, lost employment benefits, emotional distress, humiliation, and damage to his professional reputation.

105. Defendant City's actions (through its supervisors and agents) were willful, malicious, and in reckless disregard of Plaintiff's federally and state-protected rights, entitling Plaintiff to punitive damages under 42 U.S.C. § 1981a(b).

**HOSTILE WORK ENVIRONMENT**
**(In Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and The Civil Rights Act Of 1991, 42 U.S.C. § 1981)**

106. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

107. Plaintiff Anthony was subjected to unwelcome harassment based on his race due to the City (through its supervisors and agents) and the Individual Defendants' conduct, including:

    a. Defendant Austin locking the Main Bathroom, to keep Anthony from using it for his racially hostile reasons;

(a)    Defendant Smith intimidating Anthony when Anthony reported Defendant Austin's discriminatory conduct to Defendant Smith;

(b)    Defendants arranging for numerous law enforcement offers to be present, armed and wearing bulletproof jackets when they fired Anthony (but not Terry and Steven who were white);

(c)    Defendants using armed law enforcement officers to escort Anthony from the property when they fired him (but not Terry and Steven who were white); and

(d)    Other such harassing and/or unwelcome conduct as may be further proven and/or uncovered during discovery.

108. The unwelcome harassment by the Defendants was severe and pervasive such that it altered the conditions for Anthony because for months he was prevented from using the Main Bathroom during his shift while others outside the protected class for race were not prevented from doing so.

109. The unwelcome harassment by the Defendants was severe and pervasive such that it altered the conditions for Anthony because he was also subjected to ongoing negative micromanagement by Individual Defendants to which other employees outside the protected class for race were not.

110. Some basis for imputing liability for the Individual Defendants' unwelcome harassment of Anthony to the Defendant City exists because Defendants where acting as supervisors and agents of the City and therefore are imputed to the Defendant City not only by the doctrine of respondeat superior but also because the fact that the City (through its supervisors and agents) chose not to investigate Anthony's complaints about racial discrimination concerning the Bathroom Issue.

111. As a direct, proximate and foreseeable result of the City and the Individual Defendants' adverse actions, Plaintiff Anthony has suffered general and special damages, including but not

18

limited to back pay, out of pocket expenses, front pay, compensatory damages, loss of benefits, costs, and attorneys' fees.

## *MONELL* MUNICIPAL LIABILITY
### Final Policymaker Ratification (42. U.S.C. § 1983)

112. The City of Statesville is a municipal corporation and a "person" within the meaning of 42 U.S.C. § 1983.

113. Under North Carolina law and the City's delegated authority structure, the Public Utilities Director possessed final decision-making authority over employee discipline and termination within the Public Utilities Department, including authority to affirm, reverse, modify, or remand termination decisions through the grievance process. The Director's grievance determinations were final and not subject to meaningful administrative review. After subordinate officials terminated Terry, Terry submitted a written grievance to the Director appealing his termination. In that grievance, Terry expressly alleged that his termination was motivated by race discrimination and that he had previously reported discriminatory conduct to City officials.

114. The Director had full authority to overturn or modify the termination decision. The Director was aware, through Terry's grievance, that Terry had engaged in protected activity and was alleging constitutional violations. Despite this knowledge and discretionary authority, the Director deliberately upheld and affirmed Terry's termination without initiating, directing, or requiring any independent investigation into the allegations of race discrimination.

115. By affirming the termination with actual knowledge of the alleged discrimination and protected activity, the Director ratified and adopted the termination as official municipal policy. The Director's decision constituted a deliberate choice among available alternatives and was the final municipal act regarding Terry's employment. That ratification was the moving force behind the deprivation of Terry's rights under the Equal Protection Clause and 42 U.S.C. § 1981.

19

116. Similarly, under North Carolina municipal governance structure, the City Manager possessed final policymaking authority over employee terminations within the City, including authority to resolve grievance appeals without further administrative review.

117. After Stephen's termination, Stephen submitted a written grievance to the City Manager alleging race discrimination and prior protected complaints. The City Manager had authority to reverse, modify, or remand the termination decision but instead deliberately affirmed it.

118. At the time of affirmance, the City Manager was aware of Stephen's discrimination allegations and prior protected activity. The City Manager did not initiate, direct, or require any independent investigation before upholding the termination.

119. By affirming the termination with actual knowledge of alleged constitutional violations, the City Manager ratified and adopted the termination as official municipal policy. The City Manager's decision was the final municipal act and was the moving force behind the deprivation of Stephen's constitutional rights.

120. The Director's and City Manager's grievance determinations were discretionary, not ministerial. Each possessed authority to overturn or modify the termination and was not required to affirm the decision of subordinates. In exercising that authority, each made a conscious, affirmative choice to uphold the termination despite knowledge of alleged race discrimination and protected activity. Their ratifications therefore constitute official municipal policy attributable to the City under 42 U.S.C. § 1983.

121. As a direct and proximate result of the City's officials' official municipal policy, Plaintiffs each have suffered general and special damages including but limited to back pay, lost benefits, front pay, compensatory damages, pain and suffering, costs, and attorneys' fees.

## Violation of the Retaliatory Employment Discrimination Act (REDA)
### (N.C. Gen. Stat. § 95-241 *et seq.*)

122. Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

123. Plaintiff Anthony engaged in protected activity under REDA by reporting racially discriminatory conduct and workplace practices that violated public policy and state and federal law.

124. Anthony further engaged in protected activity by contacting the Equal Employment Opportunity Commission to report the City's discriminatory conduct (by its supervisors and agents).

125. Plaintiffs Terry and Stephen engaged in protected activity by corroborating and supporting Anthony's complaints regarding racially discriminatory statements and practices by their supervisor ORC Austin.

126. Defendant City (through its supervisors and agents) took adverse employment actions against Plaintiffs, including subjecting them to a retaliatory investigation and terminating their employment.

127. Defendant City (through its supervisors and agents) knew of Plaintiffs' protected activity at the time it initiated the investigation and made the decision to terminate Plaintiffs.

128. The adverse actions occurred shortly after Plaintiffs engaged in protected activity and were causally connected to that activity.

129. Defendant City's (through its supervisors and agents) stated reason for termination—alleged falsification of documents—was pretextual and not supported by an honestly held belief based on a reasonable investigation.

130. Defendant City (through its supervisors and agents) terminated Plaintiffs because they opposed and reported racially discriminatory conduct, in violation of REDA.

131. As a direct and proximate result of Defendant City's retaliatory conduct (through its supervisors and agents), Plaintiffs suffered lost wages, lost benefits, emotional distress, and other damages.

132. Defendant City's conduct (through its supervisors and agents) was willful and in reckless disregard of Plaintiffs' rights under REDA.

133. Plaintiffs are entitled to all relief available under N.C. Gen. Stat. § 95-243, including reinstatement, back pay, front pay, compensatory damages, attorneys' fees, and costs.

## WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY
### (*Coman v. Thomas Manufacturing Co.*; N.C. Gen. Stat. § 143-422.2)

134. Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

135. North Carolina has declared it the public policy of this State that employees shall be free from discrimination in employment on the basis of race, as set forth in the North Carolina Equal Employment Practices Act ("NCEEPA").

136. North Carolina recognizes a common-law claim for wrongful discharge when an employer terminates an at-will employee for reasons that contravene the public policy expressed in NCEEPA.

137. Plaintiffs Anthony, Stephen, and Terry were at-will employees of the City.

138. Plaintiff Anthony opposed race discrimination in the workplace by reporting to Defendant Smith and other agents of the City that he was being subjected to race discrimination because of the Bathroom Issue.

139. Anthony, Stephen and Terry opposed discrimination in the workplace making their respective complaints in good faith and based upon a reasonable belief that unlawful discrimination was occurring.

140. Plaintiffs Stephen and Terry opposed race discrimination in the workplace by reporting to their supervisor, ORC Austin, that locking Anthony out of the Main Bathroom for the reason stated by Defendant Austin was discriminatory such that Anthony was being treated less favorably because of his race.

141. Plaintiffs Stephen and Terry each opposed discrimination in the workplace making their respective complaints in good faith and based upon a reasonable belief that unlawful discrimination was occurring.

142. Defendants were aware of Stephen and Terry's opposition to race discrimination because they each made their complaints to their supervisor.

143. Shortly after each engaged in this protected opposition, Defendants subjected each of them to heightened scrutiny and initiated a retaliatory investigation into alleged misconduct.

144. Defendants terminated Plaintiffs' employment in reliance on the alleged results of the retaliatory sham investigation which was a pretext for the actual reason for termination, which was opposing race discrimination.

145. Defendant City's stated reason for termination was pretextual, a cover-up, and was used to mask retaliation for Plaintiffs' opposition to conduct that violated North Carolina public policy.

146. Defendants terminated Plaintiffs Anthny, Stephen, and Terry because they each opposed race discrimination.

147. Defendant's discharge of Plaintiff violated the public policy of North Carolina as expressed in NCEEPA.

148. Plaintiffs are entitled to all relief available including rein-statement, back pay, front pay, compensatory damages, attorneys' fees, and costs.

## DEFAMATION PER SE
## (TERRY AND STEPHEN)

149. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein

150. Plaintiffs are licensed and experienced wastewater treatment operators whose employment and licensure depend upon honesty, accuracy and compliance with regulatory record-keeping requirements.

151. Following Plaintiffs' wrongful termination, Terry and Stephen applied for employment with other wastewater treatment facilities and received conditional offers of employment and/or information that their skills were very much needed.

152. Terry and Stephen's prospective employers contacted the City for employment verification purposes.

153. During those communications, the City, through its agents and employees acting within the course and scope of their employment, stated that Plaintiffs were terminated for "falsifying records" ("the City's Statements").

154. The City's Statements were communicated to third parties outside of Defendant's organization.

155. The City's Statements were false.

156. Accusing licensed wastewater treatment operators of "falsifying records" imputes dishonest conduct, lack of professional integrity, and unlawful behavior.

157. The City's Statements directly impeach Plaintiff's in their trade and profession and conflict with continued employment in a regulated wastewater treatment position.

158. The City's Statements further impute criminal or quasi-criminal conduct involving regulatory and public records.

24

159. They City's Statements are defamatory per se under North Carolina law because they are susceptible of only one reasonable interpretation – that Plaintiffs engaged in dishonest and unlawful professional misconduct.

160. The City knew these statements were false.

161. The City made these statements maliciously and for the purpose of preventing Plaintiffs from obtaining future employment.

162. As a direct and proximate result of the City's defamatory statements, prospective employers rescinded conditional offers of employment previously extended to Plaintiffs and/or passed Plaintiffs over for employment.

163. Plaintiffs suffered damages including but not limited to loss of employment opportunities, lost wages, damage to their professional reputation, and emotional distress.

164. Because the City's Statements constitute defamation per se because the statements impeach Plaintiffs in their trade, profession or business, damages are presumed under North Carolina law.

165. The City's conduct was willful, malicious, and in reckless disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages pursuant to N.C. Gen. Stat. § 1D-15.

### PUNITIVE DAMAGES
### (N.C. Gen. Stat. § 1D-15 et seq.)

166. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein

167. Defendants acted with reckless and wanton disregard of each of the Plaintiffs' rights in violation of the statutory and common law of North Carolina.

168. Defendants knew or should have known that Plaintiffs each had engaged in protected activities, i.e., complaining to a supervisor and/or management about Defendant Austin's racist conduct.

25

169. Rather than investigating the Plaintiffs' complaints of race discrimination, Defendants launched a sham investigation against the three employees with the purpose of showing that each of the Plaintiffs was not performing necessary job duties so that Defendants would have an excuse to fire them.

170. When Defendants were informed that their investigation did not yield reliable results, Defendants fired the Plaintiffs anyway.

171. Each of the Plaintiffs is entitled to an award of punitive damages pursuant to North Carolina law because Defendants acted willfully, wantonly, and with actual malice when they terminated the plaintiffs. Punitive damages should be awarded in an amount to sufficiently punish Defendants and deter other employers and their high-ranking managers and supervisors from engaging in similar conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray the Court:

1. Enter judgment in favor of Plaintiffs and against all Defendants;

2. Award back pay, front pay, and lost employment benefits;

3. Award compensatory damages for any other out-of-pocket expenses as well as for emotional distress and humiliation;

4. Award damages under 42 U.S.C. § 1983 for violation of Plaintiffs' constitutional rights;

5. Award punitive damages under 42 U.S.C. § 1981a(b) and North Carolina law;

6. Award punitive damages to deter future discriminatory and retaliatory conduct;

7. Award Plaintiff punitive damages from Defendant Austin for his malicious, willful and wanton conduct, as permitted under applicable law;

8. Award reasonable attorneys' fees and costs under 42 U.S.C. § 2000e-5(k), and/or that Plaintiff be awarded interest, costs, and reasonable attorneys' fees as allowed by law;

9. For a trial by jury; and

10. Such other and further relief, both at law and in equity, as the Court deems just and proper.

Respectfully submitted, this the 16th day of February, 2026.

**GREEN MISTRETTA LAW, PLLC**

/s/ Dawn T. Mistretta
Dawn T. Mistretta, N.C. State Bar No. 31691
Stanley B. Green, N.C. State Bar No. 25539
Kaitlyn Copeland, N.C. State Bar No. 50569
1752 Heritage Center Drive, Suite 101
Wake Forest, North Carolina 27587
Telephone: (919) 278-7453
Facsimile: (855) 876-8893
dmistretta@gmlawyers.org
sgreen@gmlawyers.org
kcopeland@gmlawyers.org
*Counsel for Plaintiffs*
